May it please the Court, my name is Mike Stanley. I'm here today appearing on behalf of Yakutat, Inc. With me in the courtroom today are Michael Burns, who is the President and a shareholder in the company, as well as Michael Shanahan, who is the General Counsel. My goal today is to try to convince you that there are sound public policy reasons for directing entry of judgment in favor of Yakutat, Inc. In our briefs, we presented essentially two arguments. First, that neither NIPS nor the counsel had articulated a rational basis for exclusion of 1999 from the qualifying years for pot catcher processors. Second, we argued that this aspect of Amendment 67 violated the Magnuson-Stevens Act because it was arbitrary capricious and unfair and inequitable. In essence, the first argument was that NIPS and the counsel did not justify exclusion of 1999 from the qualifying years for this vessel class, while the second argument is that NIPS cannot justify that exclusion. Now, in my presentation today, I'm going to concentrate on the first argument, the question of whether or not there's a — they articulated a rational connection between the facts found and the choice made. I'm going to frame my remarks around a quote taken from one of the cases that's cited in our brief. This is at page 27, footnote 4. That case is Arizona Cattle Growers v. U.S. Fish and Wildlife Service, 273 F. 3rd, 1229, 9th Circuit, 2001. Now, that case involved the Endangered Species Act, not the Magnuson-Stevens Act, but it did address the question of the arbitrary and capricious standard and, in particular, the obligation to articulate a connection between facts found and choice made. The court in Arizona Cattle Growers found that the service's issuance of an incidental take statement was arbitrary and capricious because it was not supported by the record. And in doing so, the court described the agency's burden as follows, and this appears at 273 F. 3rd, 1244. And I quote, The agency has a low bar to meet, but it must at least attain it. Let me say that again. The agency has a low bar to meet, but it must at least attain it. Now, keeping this in mind and this idea of a low bar, but one that the agency must still attain, I'm going to talk about two aspects of the decision-making. First, the role of the NOAA attorneys, and secondly, the actions of NIST staff. Now, NOAA attorneys attend meetings of the Council to assist the Council in developing fishery management plans and in trying to further the goals that the Council has in mind. But the NOAA attorneys are also there to make sure that the Council fulfills its responsibilities. They're not just there for show. To some extent, I'm reminded of the comments that Attorney Brendan Sullivan made when he was representing Oliver North in the Iran Contra hearings. When challenged for whispering in his client's ear during questioning, Attorney Sullivan responded that, well, I'm not just here as a potted plant. Well, likewise, the NOAA attorneys are not at these Council meetings just as potted plants. They are there to make sure that the Council does what they're supposed to do. And in this case, the NOAA attorneys were very proactive in advising the Council that you have to justify your choices of eligibility criteria. And we've cited their quotes in our brief. In essence, using the language from Arizona cattle growers, you know, one can picture Attorneys Lindeman and Smoker talking to the Council. You could say, gentlemen, there's the bar. It's low. But you must attain it. Please step over that bar. But, of course, when it came to pot catcher processors, the Council did not. Now, the Council did step over the bar, if you will, in regards to the freezer long liners and the catcher vessels, the pot catcher vessels. In each case, providing some explanation for why it shows the eligibility criteria that it did. But the Council said nothing about pot catcher processors. And, again, using that formulation, the Council simply did not attain the bar. Counsel, you had, there were four different, as I recall, there were four different classes of vessels that were regulated here. And in the other three, as I recall, they all included 1999. This is the only one of the four categories that excluded 1999 for eligibility. Is that right? That's correct. If the agency had excluded 1999 for all four of those, would you have an argument here today? I still think the agency has to articulate a justification. So the question would then depend on, well, why did they exclude 1999? You know, 1999 is a year of present participation. And the attorney at the October meeting had advised the Council that, you know, if you're going to think about this, you need to at least consider 1999 and say why it doesn't count, because the Council does have an obligation to consider present participation. They included the years, was it 1996 to 1998, is that right, or 1995 to? I say again. The 95 to 98 or 96 to 98? For the pot catcher processors, the qualifying years are 95 to 98. Okay. Is it clear that the agency explained why it wasn't including 1994? They, no, they didn't speak to 1994. In fact, if you look at the, I'd have to go back and look at the matrices of the, that were presented. I'm not even sure that 1994 was included in the matrices of options that were presented to the Council. I'd have to look back at that. But again, 1999 I think is a little different in the sense that, given the obligation to consider present participation, it's the most immediate year before the Council is making the decision. So, again, it's not like the NOAA attorneys were asking the Council for a lot. What they were doing was trying to get the Council to state a justification. And in a sense, they were simply trying to get the Council to fulfill the NIEMS guidelines for National Standard 4. And we quote these in our brief at page 2728, specifically 50 CFR 600.325C3i, quote, the motive for making a particular allocation should be justified in terms of the objectives of the FMP, unquote. They weren't asking the Council to read into the record every last detail of the, of the environmental assessment or the analyses that have been presented to the Council. That's, the government kind of suggests that at page 32, footnote 6. They were simply wanting the Council to say something about why it chose, or chose the criteria, and in particular, why 1999 was not included for this vessel class. But, again, the Council did not discuss the criteria for this particular vessel class, and so we don't have any basis to know why they didn't include that year. Now, you know, the decision here is actually, or legally, the decision of the Secretary, right? That's true. Now, does the fact that you say, and I think I agree with your reading of the record, that the Council, you know, didn't discuss this much, does it necessarily lead to the conclusion that it means the Secretary didn't consider it? Well, I think what you have to do is then look at what NIFS did after the Council made its decision. And I think the answer is that the NIFS staff concocted a rationale to support the Council's analysis. That rationale that they prepared did not accurately reflect what the Council did. You know, NIFS didn't say that it took independent analysis of its own. It said, well, the Council did this. The Council did this. The Council did that. This is why we're approving this. It was all framed in terms of what the Council did. And if you look You're suggesting that we should look behind the staff's recommendation to suggest that the staff was misrepresenting the record to the Secretary? That's precisely what I'm saying. Can the Secretary make an independent judgment? Since it's the Secretary's decision, even if the staff has misrepresented what the Council actually considered, can the Secretary say, well, for reasons different from what the Council recommended, or for reasons that have been attributed to the Council but, in fact, aren't true, that the Council considered this, I am deciding? That's conceivable. You can have that. But the problem we have here is that, you know, the head of NIFS and his colleagues at the headquarters level are very busy people. They don't have the option to go back and review the Council record. I mean, they have the option, but as a practical matter, they don't have the time to go back and review the entire record of the Council proceedings. They have to rely on what staff tells them. So they get these briefing papers. For instance, there was that issues advisory. This is that excerpt of record, I believe, 223 through 226. And in particular, the attachment 225 and 226. That was given to Dr. Hogarth in October 2001. You know, that's the kind of material he relies on. And it misstated what the Council did. It referred to breakeven analyses and determinations of minimum income that simply didn't exist. Nowhere in the record do those things appear. And so, you know, yes, could he have made an independent determination? Yes. As a practical matter, he has to rely on what is given to him. So are you asking us to sort of appear behind the veil here? I'm not asking you to appear behind the veil. I'm asking you to see that the rationale that was finally stated by NIS when the final regulations were published, where they described, you know, the eligibility criteria, and that's specifically at excerpt of record 245 and 67 Federal Register 18134. There's comment 5, and there was a challenge to the eligibility criteria, including a comment by Yakutat, Inc. And NIS is responding, and they give their response. What I'm saying is that that response is a fabrication. It's not true. And in fact, if you trace that back, you see it's basically prepared by the same NIS staffer who earlier told Attorney Smoker, well, don't worry about it. You know, I listened to the tapes. There was a breakeven analysis. There were these determinations of minimum income. Don't worry about it. In essence, what NIS staff was telling the attorneys who continued to question the whether or not the counsel had justified its selection of criteria, and in particular focused on this question about 1999 for this special class, essentially the NIS staff is saying, don't worry about it. They stepped over the bar, you know, getting back to that Arizona cattle growers analogy. No, they stepped over the bar. Don't worry about it. I listened to the tapes. The counsel easily stepped over the bar. Well, they didn't. Merely saying that the counsel stepped over the bar does not make it so. That's really, I think, the question here. And so I think it's very, implicates very much the secretary's responsibility under the Magnuson Act. I think there are some important questions that are raised. You know, the NIS has an important statutory duty to review counsel action for consistency with the national standards and to make sure that the standards are met. You know, the system requires candor and honesty. You know, the officials there in the NIS, you know, who have ultimate responsibility, I think they have to be able to rely on what their staffs tell them. They have to be able to have confidence that they're getting the straight scoop. Now, suppose, for instance, in that October 2001 issues advisory, instead of, you know, this story about breakeven analysis and determinations of minimum income and the like, Dr. Hogarth had instead been told, well, you know, general counsel has a point here. The counsel did not say anything about why 1999 was excluded from the qualifying years for pot catcher processors. If that had been told to Dr. Hogarth, would he have made the same decision? We don't know. The point is, NIS headquarters approved Amendment 67 based on a misleading and inaccurate description of what the counsel did. The headquarters was assured that the counsel had attained the bar when, in fact, it had not. We submit that a judgment for YACDAT in this case will remind NIS that it is not simply a rubber stamp for the counsel action but has an important duty to meaningfully review counsel action under the Act. A judgment for YACDAT will promote honesty and candor in decision making and discourage post hoc rationalizations that misstate the basis for the counsel's decisions and mislead the NIS officials who must sign on. A judgment for YACDAT will reinforce the role of the NOAA attorneys whose job it is to make sure that the counsel fulfills its responsibilities. For these public policy reasons and for the other reasons set forth on our brief, we respectfully ask this Court to direct entry of judgment in favor of YACDAT,  Thank you. Thank you, Ms. Stammer. Good morning. My name is Sylvia Quast, and I represent the Federal Government appellees in this case. There's been a lot of talk about public policy in the argument you just heard, but the fact is what this case boils down to is what NIS did in this case, not what it might have done, what it might have thought about what it did and whether there was rational explanation in the record for what it did. In particular, the main concern that appellant has here, that YACDAT has here, is the decision not to include 1999 as one of the qualifying years for one category of vessel. And the fact is that this is discussed both in what NIMFS had to say in its rulemaking and it was actually also discussed by the counsel. I grant it not in great detail, but this issue of the barbarians coming over the walls into Rome, the issue of problems in the crab fishery and pot fishermen in the crab fishery fleeing the crab fishery because there just weren't enough crab there for them to fish, they were looking for another place to go, they were coming into the Pacific cod fishery, and what NIMFS was seeing and the counsel was seeing and the precipitous drop in the catch in that fishery and the fishermen were saying, hey, we've got a problem here, we have all these pot fishermen coming in from the crab fishery, you need to do something, you need to help us out. The counsel looked at the issue and said, that's right, we need to do something about this. And that was the reference to the barbarian hordes coming over the hills. So this issue was discussed about 1998 being a cutoff date. The particular significance of 1998 was that the counsel and NIMFS were already recognizing this problem early in 1999, and there was a problem more generally about trying to rationalize fisheries and participation in fisheries. And the counsel announced in January of 1999, fishermen, don't count on being able to use 1999 as a qualifying year. We're putting you on notice right now because we are seeing concerns in various fisheries, including the Pacific cod fishery. So there is a reason for this, and it's stated in the record, and the proposed rule itself specifically discusses this concern about protecting the fishermen, the concern about pot fishermen coming in from the crab fishery, and the concern about protecting the longstanding interests of those who have them. That's a proper concern, I'm sure it is, but the question is, well, you know, why draw the line at 1999? I mean, what's the justification? In other words, if you move the line back one year further, as it was for everybody else, how many more, you know, of this horde is going to get in? There's nothing to show that, is there? In other words, what it shows at that point is rational. It goes to the year later, or a year earlier. I think what shows it to be rational is the decline in the Pacific cod fishery, which the Council and NIMS specifically noted in the record. They talked about the decline in the allowable catch from 1995 to 1998, so that's one reason. Another reason that was given was that the Council – That would just justify, you know, any kind of line draw, any of their own rules. Well, there's also – and they also talk about the concern about the pot fishermen in particular. That's why you're seeing higher standards for pot fishermen being able to participate in the Pacific cod fishery. NIMS is looking for two years of involvement in the fishery rather than one. In the case of both pot fishermen, starting in 1995, looking for that long, consistent history rather than starting at 1996, for example. The real question here is how is it that the pot catchers, the much smaller vessels, got to use 1999, and the pot catcher processors, the larger vessels, didn't? And that, again, is discussed at great detail in the Council deliberations and discussed in the final rule as well. And the reality was, was that there was very heated debate. Some Council members were saying, look, we gave people a cutoff of 98. We've been concerned about these pot fishermen coming into the fishery here, and we should stick by that because otherwise people are just going to start speculating and they're going to see that we're not consistent when we're drawing lines in the sand and it doesn't really mean anything. They're going to start engaging in speculative entry in the fishery, and we don't want to do that. Another significant portion of the Council said, we've got some real concerns here about these pot fishermen, the smaller pot fishermen, the pot catchers, moving into the Gulf of Alaska, about this having an effect on local communities. And both of those considerations are things that the Council and NIFS has to take into account under 16 U.S.C. 1853b6, and that's on the record. So there's no question those were legitimate concerns. Ultimately, those ruled the day, and so more of the smaller vessels were allowed in. And, again, this is discussed a great deal by the Council, and NIFS itself also talks about the issue of consistent participation or lack of consistent participation, which Yakutet doesn't dispute. They say both sectors of the pot fishery did not have a consistent history here. So that's totally in keeping with what NIFS was saying the reason was for what it was doing and what the Council was talking about. So, in fact, there is a rationale laid out in the record. Is it laid out absolutely as clearly as I've laid it out for you here? Not perfectly. I'll grant you that. But the reasons are there, and they are given, and they make sense, and they justify what NIFS did here. At the time that NIFS decided this or the Council had this before, did they know or have a pretty good idea of what vessels were going to be qualifying vessels and what would not? Well, if they were cutting off since they were cutting off 1999, the year that they were in, it was they had a pretty good idea. Somebody could have figured out who was going to qualify and who wasn't going to qualify unless they included the year that they were in. I think they could have figured that out. There's, when you look at the record, there were, I believe, 53 options, various combinations of years requiring only one year participation, two years of participation, and you can see the Council really struggling trying to keep straight who's in and who's out. How many vessels qualified on the pot catcher processor category? Five. Only five? Only five. Okay. And if we included 1999, how many more vessels qualified? One more. Just one? Right. That would have been Yakutab, would have been the other one. I think the other thing to remember here is the Council made a decision and NIFS made a decision to favor those who had long and consistent histories in the pot fishery because of this concern about folks coming over from the crab fishery. The one boat we're talking about participated for the first time in 1997. In 1998, when they had a choice to whether they were going to longline in the fishery or use their pot here in the fishery, they chose to go with longlining the entire year. If they were significantly dependent, if they were consistent participants, they could have gone back in whenever they completed their repairs or dealt with their crew problems and used their pot here to fish. They chose not to. They went ahead and longlined. That is another indication, although something that's not discussed by the Council, but it supports the Council's reasoning that Yakutab didn't fall into this class of folks who had long and consistent histories and economic dependence on the pot cod fishery. The rationale is there in the record. It supports what NIFS did. For these reasons, what NIFS did was not arbitrary and capricious. I want to say one last word about recent participation. The fact is recent participation in the form of 99 was considered by the Council, was looked at by NIFS, but they ultimately decided, for the reasons that I've already given, not to include 199 denying with regard to the pot catcher processors. And that's all that 1853b6 requires. It doesn't set recent participation among, above all those other factors in terms of making a decision about what to do when you're setting up a limited limitation fishery. We would ask that the Court affirm, the district court below, and if there are no further questions, I'll sit down. Thank you very much, Ms. Gloss. Thank you. Mr. Stanley. Thank you, Your Honor. The reliance on what the Council did for the pot catcher vessels is very interesting because essentially what the Council or what the government is saying is that, well, the Council really hashed this out and they debated it and they decided between these competing principles to include 1999. That's precisely our point. If that same debate had occurred with respect to the pot catcher processor category, maybe they would have had to confront those issues. They would have had to confront the kind of incongruous result that using 95 and 98 lets in a vessel that last fished in 1996 and excludes this recent participant that fished in two of the three recent years, 97 and 99. You know, the Council didn't have to confront that. But maybe they would have if they had debated it. Maybe if they had debated it, they would have thought about, well, if we add 1999, it's only one more vessel. That's still less than the recent average. Maybe they would have considered. Did Yakutat participate in the rulemaking? Say again? Did Yakutat participate in the rulemaking here? Did you participate and did you submit comments? They submitted comments both on the fishery management plan and on the proposed rule. And did Yakutat protest it on the exclusion of 1999? Absolutely. Yeah, the fact that I don't have it. It's in the excerpt of the record. I can give you the specific site. But both comments that they filed are in the excerpt of the record. So, you know, again, the idea that somehow what the Council did with, we agree that what the Council did what it should do when it came to the pot catcher vessels. They had a vigorous debate and they resolved it on the record, in the open, so people knew why they came to a decision. You can't look at this record and figure out why they didn't reach the same result for pot catcher processors. Now, the government kind of keeps coming back to this. Well, they had warned everybody that participation after 1998 might not count. That's the reference to the control date. Well, if you look at that actual notice, which is excerpt of record five and six, what you see is that it's a prospective focus. They're concerned about people who, because of the American Fisheries Act, are going to be cut out after 1998 and will, for the first time in 1999, be looking around for someplace to fish with the possibility of gaining credit, a history that might be credited in a future access program. So the control date was basically saying don't expect to get in, come in, in 1999 and get anywhere. That doesn't apply in this situation. Here we have vessels that were, got in as early as 1997. But it would have put your client on notice that if you were thinking about fishing in an alternate for something else other than Pacific cod, you might wish to do so since this isn't going to count as a qualifying year for you. Well, but they had already entered. I mean, they had already entered the fishery. In fact, they've been in the cod fishery for a long time. They are a longliner. But the Blue Moon didn't fish in 1998. Is that right? They didn't fish in 1998. And for the government to say they made a business decision, that doesn't accurately reflect the record. They know full well that the company has made a claim that they didn't fish that year for unavoidable circumstances. It wasn't, you know, I mean, we can, this is not really fleshed out in the record. Is that claim still pending before the agency? That's still pending. On the resolution of that claim, does that have any impact here? If that claim were resolved in Yakutat's favor, then this case, this would have an effect on the resolution of this case. Is there any reason why we should decide this case until that decision is pending? Is this appeal premature? Well, we don't know when that appeal is going to be decided. But is this appeal premature if you have a motion pending before an agency that would moot this case? If you look at the history of NIFS's decisions on this issue, they are not inclined to award many people unavoidable circumstances credit. That still doesn't quite answer the question. Well, technically, yes. If that is resolved in their favor, then they would not need to press their case here. But this is a challenge on rulemaking. Pardon me? This is a challenge on rulemaking, not an adjudicatory matter. Right. This is a challenge on rulemaking that 1999 was not included. And we think the principle is still here, that they ought to get credit for 1999. You know, one of the things that the government does continually kind of wants to ignore is the fact that, you know, the council articulated and identified the economic dependence criteria. They said in order to be considered economically dependent on this fishery, you have to have fished in two years and have harvested 300,000 pounds in each of those years. Yeah, that meets that criteria. The only reason that they don't get in is because 1999 was cut off. Well, why was 1999 not included? You know, they were in well before the control date was announced. They were in before Amendment 67 was even brought under consideration. There should have been some explanation as to why that year was not included. The one other point I guess I wanted to make is that Your Honor asked about, well, if they'd included 1999 for a pot catcher process, how many vessels would have gotten in? And the answer that was given was six. If they had just shifted, if they'd even said, well, instead of 95 through 99, if they'd said 96 through 99, you know, that's still a four-year period, the same number of vessels would have got in. It would have been no difference whatsoever. So this fear of this big influx of effort is just not there. But what would have happened is that you would have had this recent participant, which has demonstrated economic dependence according to the criteria selected by the counsel, they would have gotten in, and a vessel which last fished in 1996 and hasn't fished since is out. I mean, that's really, I think, one of the telling things here is that this vessel that left the fishery after 1996 is going to get the endorsement. And this other company, which invested significantly in the fishery, and by the criteria that the counsel set is economically dependent on the fishery, they're cut out. So unless the Court has further questions, I'll conclude my remarks. I don't think so. But, Ms. Klost, we would like you to return to the podium. We'd like to ask you the same question about whether the administrative appeal on the question of unavoidable circumstances has any effect on our jurisdiction over this case. No, it doesn't. That's a separate proceeding, and we'd encourage the Court to reach a decision on this case. I mean, the fact is, is that Yakutat is going ahead and fishing right now with their POC year. They have an interim endorsement that they're doing while this appeal is pending, while the administrative process is pending. But do you agree with counsel that success on that petition would moot this appeal? Yes, that is correct. But you don't think that our jurisdiction to review this as a challenge on a rulemaking is dependent upon the petition that they currently have pending before the Secretary? That's correct, Your Honor. Do you have any ideas to how long it would take to resolve that administrative matter? I asked about that. And all I can tell you is that's pending right now before the Office of Administrative Appeals at NOAA, and there's no specific timeline in the regulations in terms of when they have to make a decision. It's a little bit like a decision before this Court. Is there an appeal within the department from any of that NOAA decision? They had to – there was an initial round of an administrative proceeding here, and the decision was not favorable to Yakutat in that proceeding. They appealed up to the Office of Administrative Appeals. That's where things are pending right now. When that decision is reached, the next move would be appeal to a district court. Thank you. Thank you. We thank both counsel for your argument, and Yakutat v. Evans is submitted.
judges: Browning, Tashima, Bybee